IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:22-CV-199-BO-KS

GREGORY OXENDINE, as Administrator )
of the Estate of Matthew Oxendine, )
             Plaintiff, )
              )
v. )    O R D E R
              )
GARRET PAUL HUNT, BRENT )
JEFFERSON CHAVIS, COLIN DEEN )
HUNT, STEVEN LEWIS, STEPHEN )
SHAINE HUNT, and JASON GEORGE )
ANDREWS, each in their individual )
capacities, )
             Defendants. )

This cause comes before the Court on defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has responded, defendants have replied, and a hearing on the motion was held before the undersigned on September 5, 2024, at Raleigh, North Carolina. In this posture, the motion is ripe for ruling. Also pending and ripe for ruling are defendants' motion to seal and motion for leave to manually file an exhibit. For the reasons that follow, defendants' motions are granted.

## BACKGROUND

This case arises out of the death of Matthew Oxendine on January 9, 2021, in Pembroke, North Carolina. Mr. Oxendine died after being shot by defendants, all deputies with the Robeson County Sheriff's Office. The following factual recitation is derived from the undisputed statement of material facts [DE 58-2]. The majority of the material facts are not in dispute. *Id.*

At approximately 8:00 a.m. on January 9, 2021, Mr. Oxendine went to his cousin Hope Bullard's home at 32 Janice Drive in Pembroke, North Carolina. Mr. Oxendine spent the day there with Ms. Bullard, her two minor children, and the children's father, Shawn Dial. At approximately 7:00 p.m. that evening, Mr. Dial drove Mr. Oxendine to purchase beer; Mr. Dial estimates that Mr. Oxendine drank about eight beers that evening. Mr. Oxendine remained at Ms. Bullard's home for the rest of the evening.

At approximately 9:39 p.m., Mr. Oxendine called 911. When asked if he had an emergency, he responded with statements to the effect of: "No, I'll be alright, I don't need ya'll, I'mma bleed out." [DE 50 ¶ 4]. Mr. Oxendine ended the call after the 911 operator asked if he needed an ambulance. A few minutes later, Robeson County Sheriff's Office Deputy Strickland received a call from communications informing him that an ambulance was en route to 2804 Union Chapel Road in Pembroke where a caller had indicated that his throat was cut and he was bleeding out. Deputy Strickland was unable to locate the Union Chapel Road address and called the telephone number associated with the 911 call. Mr. Oxendine answered, and once Deputy Strickland identified himself Mr. Oxendine began shouting that he had shot law enforcement in the past and had gone to prison for doing so. Mr. Oxendine stated that he had a rifle on his lap, that he would use the weapon if approached by law enforcement, and that he should be left to bleed out. Mr. Oxendine ended the call. Deputy Strickland contacted his sergeant, Sergeant Germaine, who then arrived on scene and called Mr. Oxendine. Deputy Strickland could hear the call and heard Mr. Oxendine threaten to light his car on fire and to harm the police.

Robeson County Sheriff's Office Detective Smith heard a call over dispatch at approximately 10:00 p.m. Detective Smith recognized Mr. Oxendine's name and proceeded to Fran's Place restaurant, where Sgt. Germaine and Deputy Strickland were located; Fran's Place is

across the street from Ms. Bullard's home. Detective Smith, who had a prior relationship with Mr. Oxendine, spoke to Mr. Oxendine on the telephone in an effort to calm him down. Mr. Oxendine was "extremely agitated" on the call and threatened law enforcement. *Id.* ¶ 12. Mr. Oxendine told Detective Smith that he had a gun and that he was bleeding out. Both Deputy Strickland and Detective Smith heard what sounded to them like a firearm being racked during the call. Detective Smith informed Mr. Oxendine that he would escort EMS to Mr. Oxendine's location alone, without additional law enforcement, so that Mr. Oxendine could receive medical care. Mr. Oxendine told Detective Smith that he loved him but he (Oxendine) would kill Smith if Smith approached. During Detective Smith's call with Mr. Oxendine, Mr. Oxendine was observed by law enforcement driving his vehicle along Janice Drive, a private dirt road. *See also* [DE 51-4 ¶ 10]. Detective Smith believed Mr. Oxendine may be intoxicated due to Mr. Oxendine's erratic behavior and slurred speech.

Sergeant McNeill, the SWAT Team Commander that evening, was contacted and told that Mr. Oxendine had made verbal threats to law enforcement, had made noises that sounded like a gun being racked, had attempted to light his car on fire, had a weapon, was in a residential neighborhood, and had reported that he was bleeding out. Based on these reports, Sgt. McNeill activated the SWAT Team and at 11:00 p.m. instructed them to meet at Fran's Place. Sgt. McNeill instructed the SWAT Team that they would approach Mr. Oxendine in a stack formation using an armored vehicle for cover. While setting up a perimeter around Oxendine's location, Detective Smith could see that the headliner of Mr. Oxendine's vehicle was on fire. The SWAT Team formed two stacks and moved toward Mr. Oxendine from Fran's Place, following the armored vehicle.

Sgt. McNeill walked at the front of one of the stacks holding a shield and a pistol, and all of the other SWAT Team members had their guns drawn. The defendants were each in one of the

3

stacks approaching Mr. Oxendine. Sgt. McNeill could see Mr. Oxendine sitting in the drivers' seat of a vehicle and that the headliner of the vehicle was on fire. Sgt. McNeill instructed the SWAT Team to speed up. As they approached Mr. Oxendine's vehicle, SWAT Team members shouted "Sherriff's Office" and "show us your hands" and told Mr. Oxendine to get out of the vehicle.[1] The armored vehicle then made contact with Mr. Oxendine's vehicle with Mr. Oxendine inside, though it is disputed whether the armored vehicle "bumped" or "rammed" Mr. Oxendine's vehicle.

Sgt. McNeill ordered a SWAT Team member to deploy a flashbang and Sgt. McNeill approached Mr. Oxendine's driver's side door. Sgt. McNeill then threw his shield to break Mr. Oxendine's window in an effort to distract Mr. Oxendine.[2] Sgt. McNeill noticed something on the center console of Mr. Oxendine's vehicle that looked like the stock of a long gun. Mr. Oxendine then picked up the stock, swung it across his chest, and pointed it toward Sgt. McNeill and other SWAT Team members. Sgt. McNeill yelled "gun" and dropped down on his knee. It is undisputed that the named defendants, all SWAT Team members, saw Mr. Oxendine point what they believed was a firearm toward them. The defendants then fired their weapons at Mr. Oxendine, hitting him multiple times. When Mr. Oxendine was removed from his vehicle, both he and the vehicle were on fire. Mr. Oxendine died at the scene due to multiple gun-shot wounds. Ms. Bullard and Mr. Dial were standing on Ms. Bullard's porch, behind Mr. Oxendine's vehicle, when the SWAT Team approached and when shots were fired.

Plaintiff's opposition proffers the following additional evidence. After Mr. Oxendine had spoken to law enforcement on the telephone, Ms. Bullard attempted to call and ultimately sent a

---

[1] Plaintiff indicates that this statement of fact is disputed. However, plaintiff does not dispute that the commands were given, but rather whether commands should have been used at all. [DE 57-1 ¶ 27].

[2] The same deposition testimony also refers to Sgt. McNeill having thrown his shield to break the windshield.

4

text message to the phone number used by law enforcement. She stated that Mr. Oxendine was fine and that she did not want law enforcement to come to her house. [DE 58-5 at 2] Bullard Depo. p. 23. And although Sgt. McNeill formed a plan to seize Mr. Oxendine for involuntary commitment, Sgt. McNeill failed to follow Sheriff's Office policies related to mental health commitments, crisis intervention, or barricade incidents. *See* [DE 58-17 – 58-20]. For example, though the Sheriff's Office was aware that Mr. Oxendine may be suffering from mental health concerns,[3] they approached his vehicle with a SWAT Team in formation, used an armored vehicle to attempt to disable Mr. Oxendine's vehicle, and deployed flashbangs. Plaintiff contends that all of this conflicts with Sheriff's Office policy for dealing with involuntary commitment or crisis intervention incidents.

Plaintiff identifies as material facts in dispute whether this was an involuntary commitment; whether this was a crisis intervention incident; whether Mr. Oxendine had an underlying mental health condition; whether defendants violated Sheriff's Office Policy 300, 406, and 414; whether the use of force started with the bumping or ramming of Mr. Oxendine's vehicle and included pointing firearms while deploying flashbangs; and whether Mr. Oxendine's raising an object that defendants believed was a firearm was a reasonable response to believing he was under attack.

## DISCUSSION

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue

---

[3] Plaintiff argues alternately that the Sheriff's Office was "acutely aware" of Mr. Oxendine's mental health issues [DE 57 at 2] and that there is no evidence that the Sheriff's Office had knowledge of Mr. Oxendine having mental health issues. [DE 57 at 13].

5

of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

Defendants, each of whom has been sued in his individual capacity, have raised the defense of qualified immunity. Qualified immunity shields government officials from liability for statutory or constitutional violations so long as they can reasonably believe that their conduct does not violate clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court employs a two-step procedure for determining whether qualified immunity applies that "asks first whether a constitutional violation occurred and second whether the right violated was clearly established." *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). A clearly established right requires existing precedent which places "the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (noting a case on point is not required). Qualified immunity

6

protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Plaintiff raises two claims in his second amended complaint, both under 42 U.S.C. § 1983: use of excessive force and unlawful arrest in violation of the Fourth and Fourteenth Amendments. [DE 45].

A. *Excessive force*

Law enforcement officers violate an individual's Fourth Amendment rights when they effect a seizure using excessive force. *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006). "*[A]ll* claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . .." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). This standard is objective, and thus without regard to the officer's subjective intention or motivation. *Schultz*, 455 F.3d at 477.

A court does consider, however, the facts and circumstances confronting the officer, and it must focus its attention on the moment the force was employed. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (citations omitted). Specific factors to be considered are the severity of the crime at issue, whether the suspect poses an immediate threat, and whether the suspect is actively resisting or attempting to flee. *Graham*, 490 U.S. at 396. Whether the officer's conduct was reasonable is a question of law to be decided after determining "the relevant set of facts and draw[ing] all inferences in favor of the nonmoving party to the extent supportable by the record." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis omitted).

"A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." *Elliott v. Leavitt*, 99 F.3d

7

640, 642 (4th Cir. 1996) (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)). The focus is "on the totality of the circumstances based on the information available to the Deputy immediately prior to and at the very moment he fired the fatal shots." *Knibbs v. Momphard*, 30 F.4th 200, 214 (4th Cir. 2022) (cleaned up, citation omitted); *see also Quinn v. Zerkle*, 111 F.4th 281, 296 (4th Cir. 2024) (court must decide "whether the officer had probable cause to believe that the suspect posed an imminent threat of serious physical harm to anyone at the very moment the deadly force was used.").

It is undisputed that the Sheriff's Office was not attempting to serve a warrant and had no cause to believe that Mr. Oxendine had committed any serious crimes on the evening of January 9, 2021. The first *Graham* factor therefore weighs in plaintiff's favor. *See Bailey v. Kennedy*, 349 F.3d 731, 743-44 (4th Cir. 2003); *Jones v. Buchanan*, 325 F.3d 520, 528 (4th Cir. 2003) (where offense is minor, first factor weighs in plaintiff's favor). The third *Graham* factor tips against plaintiff. Though Mr. Oxendine was not attempting to flee the scene or physically resisting arrest, he was failing to comply with law enforcement's directive to show his hands and get out of the vehicle. *See Hensley on behalf of N. Carolina v. Price*, 876 F.3d 573, 585 (4th Cir. 2017) ("If an officer directs a suspect to stop, to show his hands or the like, the suspect's continued movement likely will raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions."); *Cole v. Prince George's Cnty., Md.*, 798 F. Supp. 2d 739, 743 (D. Md. 2011) (refusal to obey commands factor in determining that force was objectively reasonable).

The second *Graham* factor, which in a deadly force case is "particularly significant", *Quinn*, 111 F.4th at 296, weighs against plaintiff. Plaintiff does not dispute that each of the defendant officers believed that Mr. Oxendine was pointing a firearm at them in the moments prior

8

to firing at Mr. Oxendine. In light of all of the facts and circumstances, even where they are construed in plaintiff's favor, that belief was reasonable.

Mr. Oxendine, whom at least some Sheriff's Office deputies knew personally, called 911 but ultimately declined to ask for help, indicating to the dispatcher that he would bleed out. Law enforcement then made several attempts to talk to Mr. Oxendine, and with each attempt were told by Mr. Oxendine that he would shoot any law enforcement who came on to his property. Several deputies heard what they believed to be the sound of a gun racking while speaking to Mr. Oxendine on the telephone. When they arrived at Mr. Oxendine's location, he was sitting in his vehicle and the headliner of the vehicle was on fire. Mr. Oxendine did not comply with commands to show his hands or get out of his vehicle. Mr. Oxendine then picked up a partial bolt stock of a rifle and pointed it at law enforcement.

It is well established that "an officer is entitled to use deadly force when a rifle is pointed directly at him or another officer in his presence." *Quinn*, 111 F.4th at 296. That what Mr. Oxendine was holding turned out to be a non-operable, partial firearm does not change the result. So long as law enforcement has "sound reason" to believe that a person is armed, law enforcement acts reasonably when firing at that person before law enforcement can directly observe a firearm or other deadly weapon. *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001). As noted above, plaintiff does not dispute that the defendants believed that Mr. Oxendine had a firearm pointed toward them. In light of the facts and circumstances present, defendants had probable cause to believe that Mr. Oxendine posed an imminent threat of serious physical harm to defendants and other law enforcement officers present. Thus, two of the three *Graham* factors weigh against plaintiff.

9

In opposition to the motion for summary judgment, plaintiff argues that the ramming of Mr. Oxendine's vehicle by the armored vehicle constituted excessive force, as did shouting commands, pointing firearms, and using flashbangs; that Mr. Oxendine was not under arrest and that defendants' decision to forcefully apprehend him created a situation likely to result in violence; and that Mr. Oxendine was entitled to resist unlawful arrest and stand his ground under North Carolina law. Plaintiff also argues that the Sheriff's Office violated its own policies in their handling of the situation. Even if the Sheriff's Office did violate its own policies, "[t]he question in a § 1983 case is not whether state law or local policy has been violated, but whether federal constitutional rights have been abridged." *Fenner v. Dawes*, 748 F. Supp. 404, 411 (E.D. Va. 1990).

First, plaintiff does not dispute that none of the named defendants were operating the armored vehicle that rammed or bumped Mr. Oxendine's vehicle. Thus, none of these defendants can be liable for any alleged excessive force arising from the operation of the armored vehicle. Second, excessive force claims concern the seizure of individuals, and seizures require "a physical touching or a submission to a show of authority." *Estate of Rodgers v. Smith*, 188 F. App'x 175, 180 (4th Cir. 2006). Shouting commands, pointing weapons, and deploying a flashbang do not amount to a physical touching, and plaintiff has not proffered evidence to create a genuine issue of fact as to whether Mr. Oxendine submitted to any show of authority.

Third, the Court is unaware of any authority which would permit a person to point a firearm at law enforcement in resistance of an allegedly unlawful arrest. Rather, "[n]o citizen can fairly expect to draw a gun on police without risking tragic consequences." *Lee v. Bevington*, 647 F. App'x 275, 283 (4th Cir. 2016). Moreover, the relevant Fourth Amendment inquiry is whether *the officers* had probable cause to believe that Mr. Oxendine posed a threat of imminent harm before

10

they fired their weapons at him, not whether Mr. Oxendine believed he was being unlawfully arrested.

The most relevant *Graham* factor weighs decidedly against plaintiff. Whether or not the Sheriff's Office could have approached the situation differently that evening, the Court must focus its attention on the moment the force was employed to determine whether defendants' conduct was reasonable. After making multiple threats to kill law enforcement that evening, Mr. Oxendine pointed what defendants reasonably believed was a functioning firearm at them before they fired their weapons at Mr. Oxendine. Their conduct did not, therefore, violate the Fourth Amendment and, as there was no constitutional violation, defendants are entitled to qualified immunity on plaintiff's excessive force claim.

B. *Unlawful arrest*

Plaintiff has also alleged a claim for unlawful arrest in violation of the Fourth Amendment. He alleges that defendants "initiated an unlawful arrest of Matthew Oxendine when they came onto his family's property without permission, rammed his vehicle with a tactical armored vehicle, and drew weapons." [DE 45 ¶ 36].

"To prevail on a section 1983 claim alleging a violation of the Fourth Amendment due to an unlawful arrest, plaintiffs must demonstrate that the arrest was not supported by probable cause." *Bostic v. Rodriguez*, 667 F. Supp. 2d 591, 607 (E.D.N.C. 2009). "Probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (internal quotations omitted) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Probable cause is determined by examining the totality of the

11

circumstances. *Smith v. Munday*, 848 F.3d 248, 253 (2017). "[T]he arrest of a person is quintessentially a seizure." *Torres v. Madrid*, 592 U.S. 306, 312 (2021) (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980).

This claim covers largely the same grounds as plaintiff's opposition to the motion for summary judgment on his excessive force claim. The arrest identified in the second amended complaint is the ramming of Mr. Oxendine's vehicle and drawing of weapons.[4] As discussed above, the named defendants did not operate the armored vehicle, and merely drawing weapons, without some show of submission to authority, is not a seizure under the Fourth Amendment.

Additionally, to the extent an arrest occurred, the totality of the circumstances support defendants' belief that Mr. Oxendine had committed or was about to commit an offense. Mr. Oxendine made several threats to law enforcement over the telephone, which under North Carolina law is a misdemeanor offense. N.C. Gen. Stat. 14-277.1. Moreover, "Officers should not 'be faulted for taking action against what they reasonably perceived to be a genuine danger to' the Plaintiff and others at the time." *Barrett v. Pae Gov't Servs., Inc.*, 975 F.3d 416, 432 (4th Cir. 2020) (citation omitted).

Sgt. McNeill has stated that it was his intention that evening, as SWAT Team Commander, to involuntarily commit Mr. Oxendine to prevent him from harming himself or others. Plaintiff relies heavily on *Bailey v. Kennedy* to argue that if defendants did not *know* that Mr. Oxendine had a mental health condition they could not seize him for an emergency mental health evaluation. In *Bailey*, the court of appeals held that a court must "assess whether the facts alleged, taken in the light most favorable to [plaintiff], indicate that [law enforcement] had probable cause to seize [the

---

[4] Merely entering Mr. Oxendine's family property without permission did not amount to a seizure. *See also Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (Fourth Amendment prohibits only unreasonable unwelcome intrusions on to private property.).

12

plaintiff] for an emergency mental evaluation." *Bailey*, 349 F.3d at 739. *Bailey* does not require that law enforcement have actual knowledge of a mental health condition. Moreover, the facts in *Bailey* are completely distinguishable. In *Bailey*, the person seized was intoxicated but sitting at a table eating lunch, was not distraught, and there were no weapons present. *Bailey*, 349 F.3d at 740. The undisputed facts in this case are that Mr. Oxendine had reported to 911 that he was bleeding out but did not want assistance, had made multiple threats to kill law enforcement, had made noises consistent with racking a weapon, had been seen driving on his private road, and had lit the headliner of his vehicle on fire while he was sitting in it. Whether Mr. Oxendine actually had a mental health condition and whether Ms. Bullard believed that everything would be alright if Mr. Oxendine was left alone are therefore not issues of *material* fact. Rather, based on the facts which plaintiff does not dispute, defendants had probable cause to believe that Mr. Oxendine was a danger to himself or others, and thus no Fourth Amendment violation occurred arising from a seizure or arrest of Mr. Oxendine that evening. Defendants are therefore entitled to qualified immunity.

### C. *Remaining motions*

Also pending for the Court's consideration are motions to seal two exhibits filed by defendants and for leave to manually file an audio recording. Defendants seek to seal two exhibits which have been marked as confidential pursuant to the protective order filed in this case and are part of the State Bureau of Investigation's investigative file, which is not subject to public disclosure pursuant to state law. *See* N.C. Gen. Stat. § 132-1.4(a). Plaintiff does not oppose the motion to seal, and defendants have demonstrated that the public's right to access is outweighed by a compelling government interest in maintaining confidentiality of investigative records. *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988). Additionally, defendants

13

have only moved to seal two exhibits in their summary judgment briefing, an audio recording and a photograph, and there is no reasonable alternative to sealing these two exhibits due to their nature. The public has had an opportunity to challenge the sealing of these documents and no opposition has been filed. *See In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984). The motion to seal is granted. The motion for leave to manually file an exhibit is also granted.

## CONCLUSION

Accordingly, for the foregoing reasons, defendants' motion for summary judgment [DE 48] is GRANTED, defendants' motion to seal [DE 53] is GRANTED, and defendants' motion for leave to manually file [DE 55] is GRANTED. The clerk is DIRECTED to enter judgment in favor of defendants and close the case.

SO ORDERED, this **13** day of September 2024.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE